An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-228

Filed 3 December 2025

Durham County, No. 22JA000090-310

IN THE MATTER OF: A.R.-B.

Appeal by respondent-mother by writ of certiorari from order entered 27 August 2024 by Judge Carol Jones in Durham County District Court. Heard in the Court of Appeals 6 November 2025.

> *Patrick A. Kuchyt for petitioner-appellee Durham County Department of Social Services.*
>
> *Administrative Office of the Courts, by NC GAL Appellate Counsel Matthew D. Wunsche, for appellee guardian ad litem.*
>
> *Garron T. Michael for respondent-appellant mother.*

PER CURIAM.

Respondent-mother ("Mother") appeals from a permanency planning order awarding guardianship of her minor child ("Aaron")[1] to his maternal uncle and his husband. After careful consideration, we affirm the order.

## I.   Background

---

[1] Pseudonyms are used for ease of reading and to protect the identities of the minor children. *See* N.C.R. App. P. 42(b).

Aaron was born in June 2013. Aaron's sister, "Angela," was born in August 2011.[2]

On 23 August 2022, the Durham County Department of Social Services ("DSS") filed a petition alleging Aaron and Angela to be abused and neglected juveniles. The petition alleged the following: On 6 June 2022, DSS received a child protective services report concerning the safety and wellbeing of the children. The report concerned a disclosure by Angela that her 53-year-old uncle, "P.Z."—the partner of her maternal aunt—touched Angela's "private parts" and breast. When Mother was informed of Angela's disclosure, Mother began yelling at Angela and telling her that it was her own fault. Intake information from the Durham Police Department incident report indicated that Mother was aware of what occurred and accepted $100 from P.Z. and Mother's sister in exchange for not reporting the incident to police. Angela also reported that P.Z. had been inappropriately touching her since she was five years old. As of the filing date of the petition, P.Z. was awaiting trial on charges associated with the allegations in the petition.

The same day as the filing of the petition, DSS obtained nonsecure custody of the children and placed them with their maternal uncle, "A.B.", and A.B.'s husband.

This matter came on for hearing on 14 November 2022 and was interpreted by a certified interpreter in Mother's first language of Chatino, a rare, indigenous

---

[2] Angela is not a subject of this action. We further note that the children's father is not a party to this action.

language of Mexico. In an order entered 18 January 2023, the trial court adjudicated Aaron to be a neglected juvenile.[3] Specifically, it concluded that Aaron was neglected in that Mother did "not provide proper care or supervision and . . . created or allowed to be created a living environment that [wa]s injurious to both of the juveniles' welfare[.]" The court authorized DSS's continued legal custody, Aaron's continued placement with A.B. and his husband, and Mother's supervised visitation with Aaron. However, the court found that it was not in the children's best interest for Mother to discuss any aspect of the case with them during her visits, particularly as regards the sexual abuse or the perpetrator. Mother was ordered: (1) to complete a mental health assessment and possible recommended therapies; (2) to complete a parenting program; (3) to maintain consistent work income and stable housing; (4) to consistently visit with the children; and (5) to maintain communication with the child protective services agent.

The trial court held a permanency planning hearing on 6 April 2023. In its order, the trial court found: Aaron was continuing "to do well in his kinship placement" with A.B., where he had been for more than 198 days. During Mother's visitation with the children on 7 February 2023, she Facetimed the children's father and she typed messages on her phone to pass to the children. As the child protective services agent explained through a court-provided interpreter neither of these actions

---

[3] Angela was also adjudicated to be an abused and neglected juvenile.

were allowed. Mother was living with a family friend and participating in therapy, case management services to obtain housing and employment, and meetings with a child protective services agent. Aaron's therapist reported that he was making progress, but also that Aaron had said it was not a "big deal" to him if he visited with Mother—that he felt like "he need[ed] to please [Mother] and do everything [she] request[ed]." Aaron chose not to attend visitation with her on 27 February 2023. Following a visitation on 28 February 2023—that Aaron had declined to attend— Angela became "visibly upset" and explained that she did not want to visit with Mother anymore because during her visit, Mother contacted a male around whom Angela had previously expressed that she felt uncomfortable. Accordingly, the trial court set the primary permanent plan to be reunification with a secondary plan of guardianship. The trial court suspended Mother's visitation with Angela, but continued her supervised visitation with Aaron, provided that he was allowed to elect not to attend.

The next permanency planning hearing was held on 17 May 2024, and the trial court entered its order on 27 August 2024. Since the last hearing, Angela had died. The evidence showed: Aaron's placement had not changed and was still meeting his needs. Mother reported being employed but had not provided any verification of her employment. She had been consistent with her visits, but Aaron often chose not to visit with her. Mother was participating in her case plan and receiving services in Spanish. However, she was "not accepting responsibility for why [Aaron] came into

care or demonstrating what she ha[d] learned in services[.]" In fact, she "continue[d] to express the allegations made by [Angela] were false and blame[d] [Angela] for [Aaron] . . . coming into care[.] [She] d[id] not demonstrate an understanding of why [Aaron] was placed in DSS custody . . . [and] d[id] not demonstrate insight regarding appropriately communicating with [him.]" The trial court further found that it was not possible for Aaron to be returned to the home immediately or within the next six months because Mother did "not have stable housing and [wa]s not demonstrating what she ha[d] learned from services[.]" The court concluded that Mother was "unfit and . . . acting in a manner inconsistent with her constitutionally protected status as a parent." Accordingly, the trial court concluded that while visitation with Mother was "consistent with the juvenile's health and safety," reunification efforts would be unsuccessful or inconsistent with his health or safety. The court determined that awarding custody and guardianship of Aaron to A.B. and his husband was in Aaron's best interests, as they were "fit and proper persons for the care, custody, and control of the juvenile" and awarded them custody and guardianship.

Mother filed her notice of appeal from the 27 August 2024 permanency planning order on 8 November 2024.[4] She also filed an electronic copy of her notice of appeal on 13 December 2024. She petitioned this Court for a writ of certiorari on 11 April 2025.

---

[4] The file stamp on Mother's notice of appeal is dated 39 October 2024. Accordingly, we reference the signed date rather than the file stamp date.

## II.    Petition for Writ of Certiorari

In her petition for writ of certiorari, Mother explains that she faced difficulty in filing her notice of appeal in a timely manner due to the language barrier that existed between her and her counsel. In our discretion, we allow Mother's petition for writ of certiorari and proceed to the merits of her appeal.

## III.    Analysis

On appeal, Mother challenges several findings of fact as not being supported by the evidence. She further argues that the trial court erred by awarding guardianship of Aaron to A.B. and his husband because the findings did not support the trial court's conclusions that she was acting in a manner inconsistent with Aaron's health and safety and her constitutionally protected status as a parent, but rather evidenced that she was in substantial compliance with her case plan. We address each argument in turn.

### A. Standard of Review

"Appellate review of a trial court's permanency planning order is restricted 'to whether there is competent evidence in the record to support the findings of fact and whether the findings support the conclusions of law.' " *In re J.M.*, 384 N.C. 584, 591, 887 S.E.2d 823, 828 (2023) (cleaned up) (quoting *In re A.P.W.*, 378 N.C. 405, 410, 861 S.E.2d 819, 825 (2021)). "The trial court's findings of fact are conclusive on appeal if unchallenged, or if supported by competent evidence in the record." *In re I.K.*, 377 N.C. 417, 422, 858 S.E.2d 607, 611 (2021) (citations omitted). "The trial court's

dispositional choices—including the decision to eliminate reunification from the permanent plan—are reviewed only for abuse of discretion, as those decisions are based upon the trial court's assessment of the child's best interests." *In re L.R.L.B.*, 377 N.C. 311, 315, 857 S.E.2d 105, 111 (2021).

## B. Challenged Findings of Fact

Mother specifically challenges Findings of Fact #14, #16, and relevant portions of #18, #30, and #34, which pertain to the issues of her demonstration of learned skills from services and her lack of stable housing. She contends that these findings are unsupported by the evidence and that, without them, the trial court's conclusions of law cannot be properly supported.

*i.     Mother's demonstration of learned skills*

Regarding Mother's demonstration of learned skills from her case services, the trial court found:

> 14.     Although she has engaged and completed services, . . . Mother is not accepting responsibility for why the juvenile came into care or demonstrating what she has learned in services[.]
>
>         . . . .
>
> 16.     Mother continues to express the allegations made by [Angela] were false and blames [Angela] for [Aaron] and his sister coming into care[.] . . . Mother does not demonstrate an understanding of why [Aaron] was placed in DSS custody[.] . . . Mother does not demonstrate insight regarding appropriately communicating with [Aaron.]
>
>         . . . .

18. It is not possible for the child to be returned to the home immediately or [within] the next six months for the following reasons[:] . . . Mother . . . is not demonstrating what she has learned from services[.]

. . . .

30. Mother is engaging in the services but is not demonstrating knowledge to achieve the permanent plans[.]

. . . .

34. Reunification efforts with the [parents] would clearly be unsuccessful and inconsistent with the minor child's health or safety, and should, therefore, cease, because . . . Mother is not demonstrating the knowledge she should have obtained from services[.]

In opposition to these findings, Mother points out that they are based on the testimony of the child protective services agent who communicated with Mother in Spanish rather than in Mother's first language, Chatino. Accordingly, Mother claims that the child protective services agent's testimony cannot competently support these findings. Mother also points out that her limited education, specifically that she had no formal education beyond the third grade, amplified the communication barrier between herself and her evaluator. To that end, Mother highlights that even when she was afforded the services of a Chatino interpreter during her parental capacity evaluation, the evaluator was unable to conduct various portions of the evaluation and specifically indicated that "[a]t times, it appeared that she did not understand the questions," which was "consistent with her extremely limited literacy and 3rd grade education." In sum, she argues that the language and educational barriers

directly impacted her ability to demonstrate what she learned through the court-ordered services, therefore, "the evidence presented [could not] competently support a finding that she was actively denying responsibility or willfully failing to demonstrate what she learned[.]" We are not persuaded.

The trial court was aware of these educational and communicative factors. This is, first, evident by the fact that it acknowledged the language barrier in its 18 January 2023 adjudication and disposition order:

> 14. With respect to the completion of reasonable efforts and the services with [Mother], the court finds that she needs a Chatino interpreter[.] It is imperative that . . . DSS has a Chatino interpreter when . . . [M]other seeks services[.] The court does not want the lack of English speaking to become a barrier to reunification[.]

Second, the trial court also continued hearings specifically for the purposes of securing a Chatino interpreter for Mother. During the 17 May 2024 permanency planning hearing, the trial court admitted a parental capacity evaluation in which the evaluator opined that Mother's prognosis for improvement with interventions was "significantly low," but also that "[g]iven the language barrier involved in [Mother]'s evaluation, results should be considered with caution."

While recognizing these potential impediments and taking them into consideration, the court nevertheless found competent evidence in the record to support its findings that Mother lacked an understanding of the reasons that her children were removed from her care and failed to demonstrate the skills she learned

from the completion of her services. A DSS agent testified during the 17 May permanency planning hearing as follows:

> Q. Do you have consistent communication with [Mother], and if so, when was the last time you spoke with her?
>
> A. I do have constant communication with her. Actually I talked with her on Monday.
>
> . . . .
>
> Q. When you communicate with her, do you speak with a Spanish interpreter or a Chatino interpreter?
>
> A. I speak with her in Spanish.
>
> Q. Does she understand the Spanish?
>
> A. Yes.
>
> . . . .
>
> Q. Do you know if that parent capacity evaluation utilized a Chatino interpreter or Spanish interpreter?
>
> A. They utilized a Chatino interpreter.

The DSS agent further testified that:

> A. . . . [T]hroughout the case, [Mother] has not really taken a form of accountability of why we're here. Looking at the evaluation that we got for the parental capacity evaluation also supports that . . . .
>
> . . . .
>
> A. I believe [Mother] has done everything we have asked her to do. It's just, she does it and she completes it, but – like for example, the parenting education course that we asked her to complete, she did that. . . . However, after speaking with the person who provided the services for her,

it just seems like she lacks the comprehension of what she's taking in.

She also just lacks understanding of why we're here in the first place, even after explaining it to her several times. I ask her a question and she – she kind of doesn't answer my questions when I ask them, and it just kind of shows that she doesn't really understand why we're here, her responsibility, her role in what got us here in the first place.

In DSS's 25 April 2024 Court Report for the 17 May permanency planning hearing, DSS reported under "Needs" for Mother:

[Mother] continues to express minimum understanding for the reasons the children came into custody. Since [Angela]'s death, [Mother] continues to express [Angela] did not tell the truth regarding allegations of sexual abuse.

On November 30, 2023, [Aaron's social worker] spoke with [Mother]'s parenting coach . . . [who] stated that [Mother] has not been an easy case. [He] also stated that . . . [the] main parenting objective [DSS] wanted him to work on with [Mother was] . . . that they wanted [Mother] to be able to believe and properly protect her children in the future if she is to be told by them and/or anyone else that something inappropriate happened. [Mother's parenting coach] stated that he couldn't really work on that objective with [Mother] due to her own versions of events which include[d] her not being convinced that [Angela] was abused. The parenting coach also went on to state that the sessions weren't as productive as he would have liked due to [Mother] constantly interrupting him and . . . ranting about how her children were wrongfully taken away from her.

DSS also noted, "[Mother] continues to express the allegations made by [Angela] are false and blame[s] [Angela] for the children being in care."

The 17 May Court Report from the guardian ad litem (GAL) contains similar observations:

> [Mother] has stated repeatedly to the GAL that the allegations in the petition . . . are lies and that she never knew anything about [Angela]'s abuse. She has stated that she is not sure what happened to [Angela] and questions why [Angela] did not get out of the car during the incident that led to the CPS report. She has stated that [Angela] was influenced by a cousin to say that she was abused. She has stated that she . . . believes [Aaron's caregiver] was responsible for [Angela]'s death.

In addition, the parental capacity evaluation, completed 19 April 2024 by a licensed psychologist through the aid of a Chatino interpreter, reported:

> [Mother's] ability to parent and provide a safe environment for her children is compromised by several factors. She appears to have a limited understanding of child supervision and safety protocols, as evidenced by her decision to leave her children unsupervised and her admission to allowing them to stay home alone. Additionally, the reports from social workers and court documents of her dismissing [Angela]'s sexual abuse reports and calling her disparaging names in front of supervised professionals [sic]. Her lack of accountability and tendency to self-focus on how [Angela]'s reporting of molestation has had a negative effect on her life [have] proved to be a barrier to understanding why her children were removed from the home.
>
> Without great insight, adequate support, and intervention, there is a risk of further harm or neglect.
>
>  . . . .
>
> One can not negate reports that [Mother] may have been complicit in [Angela]'s abuse, exchanging her for money to buy groceries. [Mother] still seems to blame [Angela] for

her accusations, stating, "*I do believe my girl went through that, but she is not here to tell me about it. She has made things very complicated.*" This statement refers to the relationship with her sister and the accusations placed upon her sister's husband. [Mother] also does not acknowledge that [Aaron] has lost his sister as she continues to disparage the family in conversations with him. [Mother]'s limited understanding of her behavior and the sexual implications of [Angela]'s molestation and death on [Aaron] do not appear to be repairable without extensive therapy for both parties.

There is ample evidence from multiple sources in the record to support a consistent theme of Mother's denial and blame-shifting concerning the issues in the case. This evidence shows that the findings—regarding Mother's lack of insight for the reasons her children came into care and her failure to demonstrate what she has learned from the case services—are supported by detailed accounts of the DSS agent, the parenting coach, the GAL, and the psychologist conducting the parental capacity evaluation. These accounts, from different individuals, evince Mother's recurring narrative: that she did nothing wrong, that Angela was largely to blame, and that the sexual-abuse allegations were false. Mother's challenges to these findings are overruled.

ii.    *Mother's housing*

Mother next challenges portions of Findings of Fact #18 and #34, both of which pertain to her housing:

18.    It is not possible for the child to be returned to the home immediately or [within] the next six months for the following reasons[:] . . . Mother does not have stable

housing . . . .

        . . . .

34.    Reunification efforts with the [parents] would clearly be unsuccessful and inconsistent with the minor child's health or safety, and should, therefore, cease, because . . . Mother . . . does not have a residence for the juvenile[ ] and does not have a safe home for the juvenile[.]

In challenging these findings, Mother relies on a DSS report which stated that she was known to be residing with her sister. Mother contends that nothing in the report indicated "that Aaron could not reside in the home or that the home was in any way unsafe." However, the GAL Court Report prepared for the 17 May 2024 permanency planning hearing stated that Mother's sister was also known to be residing with the man who was alleged to have sexually abused Angela. This was competent evidence that Mother's housing was not safe for Aaron, and Mother's argument is overruled.

## C. Inconsistency of Reunification Efforts with the Child's Health and Safety

Mother argues that the trial court's Finding of Fact #33 was not "properly supported by the evidence presented" and accordingly, "the trial court erroneously foreclosed reunification with Mother and impermissibly and erroneously granted guardianship to Aaron's maternal uncle and his husband." We disagree.

At any permanency planning hearing, under N.C. Gen. Stat. § 7B-906.2(a), a trial court shall adopt one or more of the following permanent plans that the court finds is in the juvenile's best interest: (1) reunification; (2) adoption; (3) guardianship;

(4) custody to a relative or other suitable person; (5) another planned permanent living arrangement; or (6) reinstatement of parental rights. N.C. Gen. Stat. § 7B-906.2(a) (2023).

Moreover, the court "shall adopt concurrent permanent plans and shall identify the primary and secondary plan." *Id.* § 7B-906.2(b).

> Reunification shall be a primary or secondary plan unless the court made written findings under [N.C. Gen. Stat. §] 7B-901(c) or [N.C. Gen. Stat. §] 7B-906.1(d)(3), the permanent plan is or has been achieved in accordance with subsection (a1) of this section, or the court makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety.

*Id.* Under subsection 7B-906.2(d),

> At any permanency planning hearing . . . the court shall make written findings as to each of the following, which shall demonstrate the degree of success or failure toward reunification:
>
>> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>>
>> (2) Whether the parent is actively participating in or cooperating with the plan, [DSS], and the [GAL] for the juvenile.
>>
>> (3) Whether the parent remains available to the court, [DSS], and the [GAL] for the juvenile;
>>
>> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B-906.2(d).

"N.C. Gen. Stat. § 7B-906.2(d) clearly requires the trial court to" make written findings "required to cease reunification efforts." *In re D.A.*, 258 N.C. App. 247, 254, 811 S.E.2d 729, 734 (2018).

In the present case, the trial court made the requisite findings under N.C. Gen. Stat. § 7B-906.2(d)—including Finding #33, which Mother challenges on appeal:

> 28.    [Mother] [is] not making adequate progress within a reasonable period of time under the plan[.]
>
> . . . .
>
> 30.    Mother is engaging in services but is not demonstrating knowledge to achieve the permanent plans[.] She is cooperating with [DSS] and the GAL[.]
>
> . . . .
>
> 32.    Mother is available to this [c]ourt, [DSS], and the GAL[.]
>
> 33.    [Mother is] acting inconsistently with the health and safety of the juvenile[.]

The record evidence and findings reveal that while Mother completed the components of her case plan, she failed to display an understanding of why Aaron was removed from her care and failed to demonstrate any skills learned from the services that she had completed. Mother's consistent unwillingness to accept responsibility for the reasons that Aaron came into DSS custody, inability to provide stable housing, and failure to demonstrate skills learned from completed services provide ample bases for the trial court's determination that further efforts at reunification would be unsuccessful or inconsistent with Aaron's health and safety.

*See J.M.*, 384 N.C. at 602, 887 S.E.2d at 835 (affirming the trial court's determination that reunification efforts would be inconsistent with the health and safety of the juveniles where the respondents had made progress on their case plans but they also demonstrated a "persistent unwillingness to acknowledge responsibility" for their child sustaining life-threatening, non-accidental trauma while in their care).

## D.  Acting in a Manner Inconsistent with Constitutionally Protected Status

Next, Mother challenges the trial court's determination that she was acting in a manner inconsistent with her constitutionally protected status as a parent. In furtherance of this argument, she points out that she substantially complied with her case plan in that she: (1) completed a mental health assessment and parental capacity evaluation; (2) was successfully discharged from mental health services; (3) completed a parenting program; (4) consistently exercised visitation; (5) maintained contact with the DSS agent; and (6) had employment and stable housing.

DSS and the GAL assert that Mother has waived appellate review of this issue, and we agree. Our Supreme Court has explained that a parent "must inform the trial court and the opposing parties that the parent is challenging the removal on constitutional grounds and articulate the basis for the constitutional claim." *In re K.C.*, 386 N.C. 690, 697–98, 909 S.E.2d 170, 176 (2024). Otherwise, "the constitutional claim is not preserved for appellate review." *Id.* at 698, 909 S.E.2d at 176. Here, Mother did not raise any constitutionally based arguments before the trial court. Accordingly, we conclude that Mother has waived review of this issue on appeal.

## IV.    Conclusion

We affirm the trial court's permanency planning order entered 27 August 2024.

AFFIRMED.

Panel consisting of Judges ZACHARY, GORE, and FREEMAN.

Report per Rule 30(e).